# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 24-1860V

|  |  |
|---|---|
| MIRIAM ZAMAGO, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: April 20, 2026 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Amy A. Senerth, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Emilie Williams, U.S. Department of Justice, Washington, DC, for Respondent.*

**FINDINGS OF FACT**[1]

On November 12, 2024, Miriam Zamago filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that that she suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine received on March 22, 2023. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons set forth below, I find that Petitioner likely suffered the residual effects of her condition for more than six months.

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

## I.    Procedural History

Respondent filed a Rule 4(c) Report arguing this case is not appropriate for compensation because Petitioner had not satisfied the statutory "severity requirement." (ECF No. 12 at *6-8). Following my review of the record, I directed Petitioner to show cause why the case should not be dismissed (ECF No. 14). Petitioner and Respondent have filed briefs on the issue, and Petitioner filed additional testimonial evidence (ECF Nos. 15-17, 21).

## II.    Relevant Evidence

### A.    Medical Records

Petitioner received the vaccine at issue in her left deltoid on March 22, 2023. Ex. 2 at 234. A week later, she was seen in urgent care for dizziness, ringing in her ears, and eye problems. *Id*. at 244. She did not mention shoulder concerns. *Id*.

On April 5, 2023, Petitioner was seen both via telehealth and in-person at an urgent care facility for left shoulder pain. Ex. 2 at 263-65. She reported that her pain began immediately upon vaccination, and had persisted since that time. *Id*. at 264. On examination, her left shoulder was tender, with reduced range of motion ("ROM"). *Id*. The doctor suspected tendonitis or subacromial bursitis, and provided exercises and a physical therapy ("PT") referral. *Id*. Petitioner was advised to use rest, ice, compression, non-steroidal anti-inflammatory medication, and/or Tylenol for pain relief. *Id*.

On April 18, 2023, Petitioner underwent a PT evaluation of her left shoulder. Ex. 2 at 278. She rated her pain five out of ten, but worse when reaching overhead. *Id*. at 279. On examination, her left shoulder exhibited reduced active ROM, reduced strength, and positive impingement signs. *Id*. Petitioner elected to proceed with a home exercise program and return as needed. *Id*. at 281. She did not return for care, and was formally discharged on May 31, 2023. *Id*.

Petitioner subsequently attended four appointments with primary care providers ("PCP") (internal medicine or family practice) in June and July 2023 (June 2, June 22, July 11, and July 20). Ex. 2 at 291-334. It appears that two were telehealth appointments, and two were office visits. She sought care for a skin lesion (*id*. at 292), hair loss (*id*. at 298), and dizziness (*id*. at 318, 333). None of the records from these appointments mention shoulder pain. Petitioner also saw a family medicine doctor by telemedicine on November 8, 2023, for a rash around her mouth. *Id*. at 347. The record of this visit also does not mention shoulder pain.

On January 19, 2024 – eight months after Petitioner last sought care for her shoulder pain, and ten months after vaccination – Petitioner returned to PT for left shoulder pain. Ex. 2 at 376. She noted that she had received a vaccine in March 2023,

2

and "since then had a lot of pain." *Id*. Her shoulder had improved with medication,[3] but was "now hurting more." *Id*. Her pain was low to moderate. *Id*. at 377. On examination, her left shoulder exhibited somewhat reduced active and passive ROM and reduced strength, with positive impingement signs. *Id*. at 377-78.

About two weeks later (February 4, 2024), Petitioner was seen at urgent care for pain in her opposite (right) shoulder. Ex. 2 at 381. That morning when she woke up and stretched, she heard a "liquid pop" and now had persistent neck and upper back pain. *Id*. at 383. She reported no left arm numbness or weakness, and did not complain of any concerns with her left shoulder. *Id*. Petitioner had two appointments with PCPs for gastrointestinal symptoms in March 2024; the records of these visits do not mention shoulder pain. *Id*. at 396-407.

On March 20, 2024, Petitioner messaged her PT provider about an orthopedic referral. Ex. 2 at 425. The physical therapist responded that it had "been a long time!" and Petitioner would need a referral. *Id*. at 427. The next day, Petitioner messaged a family practice doctor stating that she had gotten a "flu shot in my tendon" and could not lift her arm up all the way. *Id*. at 428. She was referred to an orthopedist. *Id*. at 430.

Petitioner saw an orthopedist on April 18, 2024 for left shoulder pain.[4] Ex. 2 at 437. She complained of "left shoulder pain present for 1 year" that she attributed to vaccination. *Id*. at 438. She rated her pain five out of ten, stating it interfered with daily activities such as doing hair, putting on a bra, and overhead activity. *Id*. On examination, her left shoulder ROM was slightly reduced compared to her right shoulder, with minor strength deficits. *Id*. at 443. The orthopedist thought she likely had tendonitis, and ordered an MRI. *Id*. at 445.

Petitioner underwent an MRI on May 31, 2024. Ex. 2 at 492. The MRI showed tendinosis of the supraspinatus as well as mild subacromial/subdeltoid bursitis. *Id*. Her orthopedist messaged her that these terms were "a fancy way of saying inflammation in and around the rotator cuff," with no tear in need of repair. *Id*. at 459. He recommended conservative treatment, saying that her condition should improve with home exercises. *Id*.

---

[3] The only medication that appears to be referred to in prior medical records is over the counter non-steroidal anti-inflammatory drugs and Tylenol. If Petitioner has treated with other medication(s), she should identify where these records are or file them.

[4] It appears that Petitioner did not attend a scheduled orthopedic appointment on April 4, 2024. Ex. 2 at 433.

### B.    Testimonial Evidence

Petitioner has submitted two declarations[5] in support of her claim. Exs. 3, 4. She states that after her April 2023 PT evaluation, the therapist told her there was nothing more they could do for her shoulder, and advised her to continue doing the exercises at home. Ex. 4 at ¶ 5. In the following months, Petitioner continued to experience pain and restricted movement in her left shoulder, but thought it would improve with time and home exercises. *Id*. at ¶ 6. Petitioner states that she *did* in fact mention her shoulder pain to her PCP at times during the eight-month treatment gap, but her concerns were dismissed or not addressed because each visit was limited to one problem. *Id*. As a result, she stopped bringing it up, thinking the PCP was unable to help. *Id*.

During this time, the pain in Petitioner's arm remained consistent and did not improve. Ex. 4 at ¶ 7. She took over-the-counter pain medication, which helped temporarily, but did not improve the pain or mobility restrictions. *Id*.

Petitioner returned to PT in January 2024 because she wanted an MRI to determine exactly what was wrong with her shoulder. Ex. 4 at ¶ 8. She states she requested an MRI from her doctor, but he told her the referral had to come from a physical therapist. *Id*. The therapist told her she could not order an MRI and Petitioner would need to see an orthopedist. *Id*. Petitioner adds that because of the ongoing limitations in her left arm, she has relied more heavily on her right arm, resulting in right arm pain. *Id*. at ¶ 9.

Petitioner's sister, Maricela Zamago, also submitted a declaration. Ex. 5. Maricela states that a few days after vaccination, Petitioner told her that the injection site was still painful in a way that did not feel normal. *Id*. at ¶ 2. Maricela explains that she and Petitioner have had a small business for seven years buying clothes from thrift stores and selling them. *Id*. at ¶ 4. Prior to vaccination, Petitioner could shop for hours without problem. *Id*. After vaccination, however, Petitioner's physical ability changed noticeably. *Id*. She now reported difficulty moving hangers and lifting items when shopping, and could only shop for about 45 minutes at a time. *Id*.

Maricela also noticed that Petitioner had to stop exercising completely after vaccination. Ex. 5 at ¶ 5. Even simple movements such as stretching or lifting light objects were difficult. *Id*. Maricela also noticed a decline in Petitioner's mental health. *Id*. at ¶ 6. Petitioner was sad and frustrated that she could no longer do the things she loved the most. *Id*.

## III.    Legal Standard

Before compensation can be awarded under the Vaccine Act, a petitioner must

---

[5] Although Petitioner labeled these filings, as well as Exhibit 5, as affidavits, they are not notarized. Nonetheless, they are acceptable as declarations pursuant to 28 U.S.C. § 1746.

preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[6] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged

---

[6] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged

6

signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

## IV.    Parties' Arguments

Petitioner argues that the eight-month interval between April 2023 and January 2024 reflected self-management of her condition, not recovery or a lapse in pain. Petitioner's Response, filed Nov. 14, 2025, at *8 (ECF No. 16) ("Pet."). She did not seek care during this time because she was following her provider's instructions for conservative, home-based management. Pet. at *6. And she states that she mentioned her shoulder pain during PCP visits during that gap, but those appointments were limited to other medical issues. *Id*. at *8.

Respondent argues that Petitioner has not satisfied the severity requirement. Respondent's Response, filed Jan. 28, 2026, at *3 (ECF No. 21) ("Resp."). Respondent asserts that long gaps in care can prevent a petitioner from satisfying the severity requirement in a SIRVA case. Resp. at *3. And Petitioner has not submitted additional objective evidence. *Id*. at *4. Although Petitioner submitted additional testimonial evidence, Respondent asserts that it was "created for the purpose of litigation and submitted in response to the Court's Show Cause Order and should be weighted accordingly." *Id*.

## V.    Finding of Fact Concerning Severity

The evidence supports a finding that Petitioner likely experienced residual effects of her condition for more than six months. Although she only obtained initial treatment for about one month before a gap, at the last treatment – the April 2023 PT evaluation – she remained symptomatic. At that time, she reported a pain level of five out of ten, and

exhibited reduced ROM and strength as well as positive impingement signs. Thus, Petitioner could not be said to have recovered as of that time.

Whether a treatment gap results in a finding that the statutory severity requirement is not satisfied depends on the facts and circumstances of the case. In this case, Petitioner's pain and reduced ROM had *not* likely subsided at the time she stopped seeking care. At her PT evaluation just before the gap, she exhibited reduced ROM and reported a pain level of five out of ten. Petitioner explains that she stopped seeking care because she was told there was nothing that could be done for her, other than home exercises.

When Petitioner again sought care for shoulder pain in January 2024, she stated that her pain had been present since vaccination in March 2023. She reported low to moderate pain, and continued to exhibit reduced ROM and strength, with positive impingement signs. Thus, during the treatment gap, Petitioner's pain levels appear to have improved, but her reduced ROM persisted.

Petitioner has also credibly testified that, during the treatment gap, she reported her pain to her PCP, who was dismissive and did not record her complaints. And the similarity of her symptoms in January 2024 to her symptoms in April 2023 supports her assertion that her pain and limitations never went away. Rather, she temporarily stopped seeking care because treaters had told her they could not do anything. I do not make this finding based on testimonial evidence alone, but instead have determined that the medical records corroborate and support Petitioner's witness statements.

Although I find that Petitioner has preponderantly met the statutory severity requirement, the minimal amount of care Petitioner sought and the lengthy treatment gap are highly relevant to damages, suggesting that Petitioner's injury was not sufficiently impactful on her daily activities to require much attention. As such, I would expect compensation in this case to be low.

**Accordingly:**

- **Respondent shall file, by no later than <u>Friday, May 22, 2026</u>, an amended Rule 4(c) Report or a status report stating how he wishes to proceed.**

- **Petitioner shall file, by no later than <u>Friday, May 22, 2026</u>, a status report providing an update on the parties' discussions, including whether and when Petitioner has served a demand.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

8